**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA**,

    Plaintiff,

vs.                                                                                     No. CR 09-1243 MCA

**ANGEL SANCHEZ MARTA,**

    Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on *Angel Marta's Motion to Suppress* [Doc. 33], filed June 11, 2009. On May 13, 2009, Defendant was charged in a one-count *Information* with being a felon in possession of firearms, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). [See Doc. 23]. In his *Motion*, Defendant argues that all evidence seized and statements made during his November 1, 2008, encounter with Deputy Alan Franzoy must be suppressed because (1) "there was no constitutionally valid basis for Defendant's traffic stop" [Doc. 33 at 3]; and (2) even if the Court were to find the stop constitutionally valid, "the length and scope of [the ensuing] detention was constitutionally infirm. . . ." [Id. at 4].

On August 19, 2009, the Court held an evidentiary hearing on Defendant's motion. Having fully considered the pleadings of record, the applicable law, the evidence and arguments of counsel, and otherwise being fully advised in the premises, the Court denies the motion based upon the following findings of fact and conclusions of law.

## I. THE COURT ENTERS THE FOLLOWING FINDINGS OF FACT

1. Alan Franzoy is a deputy sheriff with the Dona Ana (New Mexico) Sheriff's Department and has been so employed for 11 years. Deputy Franzoy is assigned to patrol the Hatch district of Dona Ana County.

2. Early on the morning of November 1, 2008, Deputy Franzoy was conducting patrol duties in a remote desert area northeast of Anthony, New Mexico.

3. As Deputy Franzoy headed to the northern part of his patrol area, he drove through a gravel pit, which he knew to be used for target practice. He also knew that shooters tended to leave their targets and other "junk" in the pit.

4. Deputy Franzoy testified that, on the morning of November 1, 2008, as he drove through the gravel pit, he did not notice any discarded targets.

5. I find and accept as credible Deputy Franzoy's testimony on this point.

6. At about 12:40 p.m. on November 1, 2008, Deputy Franzoy had taken up a stationary position north of the gravel pit and had exited his patrol unit when he heard seven or eight gunshots fired in rapid succession.

7. Believing that the sounds came from an area to his south, Deputy Franzoy decided to drive back down to the gravel pit to see if he could determine from where the shots were fired.

8. As he drove into the gravel pit, Deputy Franzoy observed a silver, dual-axle Dodge pickup begin to exit the area.

9. Defendant, Angel Marta Sanchez, was the driver of the Dodge pickup.

10. Deputy Franzoy testified that he now also "noticed there were some, some targets, what you call targets, trash, like cans, several cans; objects that were placed out against the bank on the northeast side of the gravel pit." [Doc. 48, Supp. Hrng. Test. of Deputy Alan Franzoy, at 12].

11. I find and accept as credible Deputy Franzoy's testimony on this point.

12. I further find and accept as credible Deputy Franzoy's testimony that, because he had not noticed these targets on his earlier drive through the gravel pit that same morning, he "tied it" that the driver of the exiting Dodge pickup had probably been shooting and left his targets in the gravel pit.

13. At that time, Deputy Franzoy decided to stop the Dodge pickup.

14. Deputy Franzoy then stopped the pickup, exited his vehicle, and approached the Dodge on foot.

15. Deputy Franzoy testified that, as he approached the pickup, his "big concern was the littering." [Doc. 48 at 26]. As he explained, he was concerned with the amount of littering he sees in the area, and the fact that the gravel pit was a work site. Thus, at this point in time, Deputy Franzoy was thinking that "here's somebody that's out shooting and just not picking up their trash and leaving it there." [Id. at 27]. Officer Franzoy also testified that he was concerned about safety because he "[h]ad no idea . . . what was going on." [Id. at 26].

16. I find and accept as credible Deputy Franzoy's testimony that his concerns as he approached Defendant's pickup were both the littering and his own safety. I further

3

find that at this point in time Deputy Franzoy possessed a reasonable suspicion that Defendant had just committed the misdemeanor offense of littering.[1]

17. Deputy Franzoy then began speaking with Defendant, asking whether he had been shooting. When Defendant responded affirmatively, Deputy Franzoy asked why he had left his targets and whether he was going to pick them up.

18. Deputy Franzoy testified that because the Dodge pickup was a dual-axle truck, it "s[at] up a little bit higher." [Doc. 48 at 16]. As a consequence it was hard for Deputy Franzoy to see inside, but he was able to view the console, "which was high enough to see that there was one gun. . . ." [Id.].

19. I find and accept as credible Deputy Franzoy's testimony that he observed a gun on the console of the Dodge pickup.

20. Deputy Franzoy testified that Defendant expressed an interest in retrieving his targets,

---

[1] Section 30-8-4 of the New Mexico Statutes Annotated provides, in pertinent part:

A. Littering consists of discarding refuse:

(1) on public property in any manner other than by placing the refuse in a receptacle provided for the purpose by the responsible governmental authorities, or otherwise in accordance with lawful direction; or

(2) on private property not owned or lawfully occupied or controlled by the person, except with the consent of the owner, lessee or occupant thereof.

B. Whoever commits littering is guilty of a petty misdemeanor. The use of uniform traffic citations is authorized for the enforcement of this section.

N.M. Stat. Ann. § 30-8-4 (1978).

which Deputy Franzoy "was really good with[,]" since he believed it would be a safer course to separate Defendant from the firearm that Deputy Franzoy had observed on the console.

21. As Defendant began to pick up the targets and place them in the bed of his pickup, Deputy Franzoy began to have an "inkling" that he knew Defendant.

22. The *Crime/Incident Report* that Deputy Franzoy completed after his encounter with Defendant reveals that the encounter lasted from 12:59 p.m. until 13:26 p.m. on November 1, 2008. [See Exh A].

23. It was not until later in his 27-minute encounter with Defendant that Deputy Franzoy remembered that he had dealt with Defendant two years earlier, in August 2006, when Deputy Franzoy had assisted federal agents in transporting Defendant, who at that time was being arrested for firearms offenses.

24. On the earlier occasion, Deputy Franzoy was serving as a "marked presence" for plainclothes ATF agents who were conducting a firearms "buy bust" in Anthony, New Mexico.

25. Defendant was arrested during the "buy bust" and it was Deputy Franzoy's job to transport him, in his patrol unit, from the scene of the arrest to the fire station.

26. Deputy Franzoy testified that he spent approximately 45 minutes in Defendant's presence in August 2006, and that, while Defendant was in Deputy Franzoy's patrol unit, the men made "small talk" over Defendant's involvement in the firearms case.

27. I find and accept as credible Deputy Franzoy's testimony on this point.

28. Thus, on November 1, 2008, while Deputy Franzoy watched Defendant retrieve his targets, he had an "inkling" that he knew Defendant, but he did not fully remember from where, nor did he fully remember Defendant himself.

29. At the suppression hearing, Deputy Franzoy testified inconsistently as to when, precisely, he realized that he knew Defendant from their prior dealings in August 2006.

30. By one account which he offered during his direct examination ("the direct-exam version"), Deputy Franzoy testified that, as Defendant returned to his pickup after having retrieved his targets, Deputy Franzoy "start[ed] to feel [as if he knew Defendant] probably from [the August 2006] encounter." [Doc. 48 at 18]. By this account, Deputy Franzoy and Defendant were standing beside the Dodge when Deputy Franzoy asked if Defendant had ever been arrested. Defendant responded affirmatively and, upon further questioning, told Deputy Franzoy that he had "sold a gun to someone a couple years ago that [he] shouldn't have." [Id.].

31. Under the direct-exam version, Deputy Franzoy took Defendant's driver's license and called his dispatcher to check on any wants and warrants, and "just run his information through the system." [Doc. 48 at 19].

32. The wants-and-warrants check took approximately four or five minutes, during which time Defendant was leaning nervously against his pickup.

33. According to Deputy Franzoy, he "already had put the pieces together and remembered the case that [he had] dealt with [Defendant] prior to that, and knew why

6

he would be nervous. . . ." [Doc. 48 at 20].

34. Under the direct-exam version, the dispatcher's report on Defendant returned "clear" and Deputy Franzoy asked for and received consent to search the Dodge pickup, in which he found two firearms, an unassembled firearm, and a box of ammunition.

35. I find that, by the direct-exam version of the events, Deputy Franzoy fully remembered his August 2006 interaction with Defendant not later than the time Defendant's information returned from the dispatcher as "clear."

36. However, on cross-examination, Deputy Franzoy was taken through the events of November 1, 2008 somewhat more chronologically precisely and carefully. On cross-examination, Deputy Franzoy offered a more detailed description of the pertinent timeline. Deputy Franzoy, on cross-examination, still offered somewhat conflicting accounts ("the first cross-exam version" and "the second cross-exam version").

37. On cross-examination, Deputy Franzoy first testified that (1) at the time he asked for Defendant's identification; (2) when Defendant's information returned from dispatch as "clear;" *and* (3) before he began questioning Defendant about any criminal history, he did not remember having previously encountered Defendant. By this first cross-exam version, Deputy Franzoy testified that, when the information returned "clear" and before questioning began, he "didn't have a suspicion about any other case then." [Doc. 48 at 36].

38. Notwithstanding, Deputy Franzoy testified that the littering case was still ongoing when the information returned as "clear," and that there was still a need to detain

Defendant because of Deputy Franzoy's intention to write a littering citation.

39. I find and accept as credible Deputy Franzoy's testimony that when the wants-and-warrants check returned "clear," Deputy Franzoy was still pursuing a littering investigation and intended to issue a Defendant a citation for that offense. Consequently, I find that Defendant was under investigative detention when Deputy Franzoy conducted his wants-and-warrants check.

40. Deputy Franzoy also testified that, at some point, the littering case became "moot" because he began to suspect that he was investigating a firearms offense. However, Deputy Franzoy was unable to pinpoint precisely when the littering case became moot. Rather, he testified that he "probably just completely forgot about the littering *after the events of everything happening*." [Doc. 48 at 28 (emphasis added)].

41. By the second cross-exam version of events, "when [Defendant] came back clear, [Deputy Franzoy] still didn't recognize exactly where he was from, where [he] knew him from. [Deputy Franzoy] *had that inkling that [he] knew him, but [he] didn't know why*." [Doc. 48 at 37 (emphasis added)].

42. That Deputy Franzoy still did not fully recognize Defendant at this point is further supported by Deputy Franzoy's testimony that, at the time Defendant's information returned as "clear," Deputy Franzoy still had no suspicion of any criminal activity other than the littering.

43. However, Deputy Franzoy also testified that "[a]s [he] ran [Defendant's] ID, then [he] remembered the name [and that] it was after that that [Deputy Franzoy] walked back

8

to him and asked him if he had ever been arrested before." [Doc. 48 at 38]. He also testified that "[w]henever [he] got his license, the name helped to jog [his] memory a little bit more about who he was. When [Deputy Franzoy] walked back over to him and asked him that question, [he] already had placed who [Defendant] was." [Id. at 39].

44. Furthermore, in the *Crime/Incident Report* that he testified to having dictated within 24 hours of his November 1, 2008, encounter with Defendant, Deputy Franzoy stated that after he had his dispatcher check Defendant's information, and it came back "clear," Deputy Franzoy "asked Mr. Marta if he had ever been arrested before and he [replied] a couple of years ago he had been arrested for selling a couple of guns to someone. [Deputy Franzoy] asked him if he was convicted of that and he said yes that he was." [Exh. A at 11].

45. The *Crime/Incident Report* goes on to describe that "when Angel Marta told [Deputy Franzoy about his previous arrest for selling guns [Deputy Franzoy] remembered that [he] had placed Mr. Marta in [his] unit after he was arrested by ATF agents for selling guns to Mexican cartel members." [Exh. A at 11].

46. At the suppression hearing, however, Deputy Franzoy clarified what was contained in his *Crime/Incident Report*, explaining that as of the time he asked whether Defendant had ever been arrested, he already had recognized him, and that when Defendant stated that he had been arrested for selling guns, Deputy Franzoy already knew what the answer to his question was going to be.

47. According to Deputy Franzoy, when he "had [Defendant's] driver's license, once [he] saw the name, the driver's license and saw the name, then [he] remembered who [Defendant] was." [Doc. 48 at 40]. Seeing Defendant's name, explained Deputy Franzoy, "helped to draw it all together." [Id.].

48. Deputy Franzoy also credibly explained that "there's no way [he] can put everything down in [his] report [and that] the report is there to help [him] remember." [Doc. 48 at 39, 41].

49. After remembering Defendant, Officer Franzoy then received verbal consent to search Defendant's pickup, from which Deputy Franzoy recovered ammunition and three firearms. [Exh. A at 11-12].

50. During the search—and for purposes of officer safety—Deputy Franzoy handcuffed and attached Defendant to the tailgate of Deputy Franzoy's police unit, because the unit was not caged.

51. Deputy Franzoy did not issue any citations to Defendant and he released Defendant to return to his home.

52. I find that Deputy Franzoy testified inconsistently about when, precisely, he remembered Defendant from their August 2006 interaction, testifying variously that remembrance occurred (1) when Deputy Franzoy saw Defendant's name on his identifying documentation, which was *before* Deputy Franzoy relayed the information to his dispatcher, and (2) not until *after* Defendant's information had already returned as "clear."

53. However, notwithstanding these inconsistencies, I find that overall Deputy Franzoy projected a straightforward and genuine demeanor at the suppression hearing. Accordingly, I credit his explanation at the hearing that as of the time he asked Defendant if he had been arrested previously, he already recognized and remembered Defendant from his August 2006 encounter with him; therefore, Deputy Franzoy knew what the answer to that question was going to be.

54. I further find and accept as credible Deputy Franzoy's testimony that, when Defendant's information returned "clear," Deputy Franzoy still had the intention of writing him a littering citation.

55. Additionally, I find and accept as credible Deputy Franzoy's testimony that, while his littering investigation ultimately became moot, it was still ongoing at the time that Defendant's information returned as "clear."

56. Thus, I find that, at the time Deputy Franzoy asked if Defendant had ever been arrested, already knowing what the answer to that question was going to be, Defendant was still under investigative detention for the littering offense.

57. Finally, I find that, at whatever precise time in the sequence of events Deputy Franzoy remembered that he had previously dealt with Defendant during his August 2006, firearms-offense arrest, Deputy Franzoy's question to Defendant—"Have you ever been arrested before?"—did not appreciably lengthen the detention.

## II. LEGAL ANALYSIS AND CONCLUSIONS OF LAW

### A.     The Constitutionality of the Initial Stop

The standard for assessing the constitutional validity of a traffic stop is well-known: such a stop will be deemed valid so long as the initiating officer had "a reasonable articulable suspicion that a traffic or equipment violation ha[d] occurred or [was] occurring." United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998).  Since an ordinary traffic stop is analogous to an investigative detention, the Court analyzes such a stop under the principles pertaining to investigatory detentions set forth in Terry v. Ohio, 392 U.S. 1 (1968).  United States v. Tibbetts, 396 F.3d 1132, 1136 (10th Cir. 2005). To determine the reasonableness of an investigative detention, the Court conducts a two-part inquiry, asking first whether the officer's action was justified at its inception, and, second, whether it was reasonably related in scope to the circumstances justifying the interference in the first place.  Hunnicutt, 135 F.3d at 1348.  However, not every stop that involves an automobile is properly deemed "a traffic stop."  In other words, the fact that an individual is detained while the individual happens to be in a car does not transform an otherwise ordinary Terry stop into a traffic stop.

For example, in United States v. Elkins, Albuquerque Police Department street-gang detectives patrolling Albuquerque's "war zone" stopped and searched a maroon Chrysler New Yorker *not* because of a perceived traffic or equipment violation but, instead, because (1) the New Yorker had been identified as one involved in a drive-by shooting; (2) the same car had been seen at a known gang member's address on several occasions; and (3) there were reports of shots being fired in the neighborhood near the time the vehicle was observed.

United States v. Elkins, 70 F.3d 81, 83 (10th Cir. 1995). On these three bases, the Tenth Circuit agreed with the district court's conclusion that the detectives possessed reasonable, articulable suspicion that the New Yorker's occupants had been, were, or were about to be engaged in criminal activity. Id. The only allusion to a traffic violation was when the Circuit noted that the New Yorker's failure to stop immediately when signaled to do so provided *additional* justification for the investigative detention. Id. However, both the district and circuit courts clearly analyzed the stop, even though a vehicle was involved, as a Terry stop and not a traffic stop.

Similarly, in United States v. Nicholson, the Tenth Circuit upheld as a reasonable investigative detention the stop and questioning of a driver who (1) had been seen entering and remaining for only a few minutes in a house where a controlled heroin purchase had just taken place; and (2) was driving a car that matched the description of a vehicle agents believed was being used to promote drug trafficking. United States v. Nicholson, 983 F.2d 983, 987 (10th Cir. 1993). Again, the circuit did not treat the stop, which happened to involve an automobile, as a traffic stop subject to the Hunnicutt standard but, instead, as "an investigative detention for questioning," subject to the Terry standard. See id.

In the instant, Defendant argues that "all evidence (verbal and tangible) must be suppressed[]" because "Deputy Franzoy did not observe (and certainly did not cite Defendant for) any traffic or equipment violation[; a]ccordingly, there was no constitutionally valid basis for Defendant's traffic stop. . . ." [Doc. 33 at 3]. Defendant, however, focuses on the incorrect standard, because the justification for the stop was not a traffic violation; instead,

13

the justification was Deputy Franzoy's reasonable, articulable suspicion that Defendant had just committed the offense of littering.

A similar issue arose in State v. Taylor, where, on the basis of a citizen complaint, a patrol officer stopped a car whose driver (the defendant), the complaining citizen believed—and told the officer—had just thrown trash out of the window. According to the complainant, the car also looked like the vehicle used in the theft of the complainant's air compressor six months earlier. State v. Taylor, 973 P.2d 246, 248 (N.M.App. 1998). A subsequent search of the car revealed rocks of crack cocaine hidden between the seat and the transmission housing. Id. at 249.

Affirming the trial court's determination that the stop was supported by reasonable suspicion of criminal activity, the Court of Appeals concluded that, given the circumstances, "a person of reasonable caution" would have believed that the defendant "had violated or was violating the law[,]" since "'[a] person who purports to be a witness or a victim of a crime may be presumed reliable[.]'" Taylor, 973 P.2d at 250 (*quoting* State v. Michael G., 748 P.2d 17, 20 (Ct.App.1987)).

The court rejected the contention that the misdemeanor offense of littering was insufficient to create a reasonable suspicion of criminal activity, particularly where the patrol officer, who did not actually observe the act, could not have made an arrest for a misdemeanor offense that was not committed in his presence. The court explained that, even though the officer might not have been able to arrest the defendant, the officer nevertheless "had a valid basis to investigate the commission of the alleged crime." Taylor, 973 P.2d at

250. Indeed, the court explained that it "kn[e]w of no law, and Defendant ha[d] cited none, that limits investigatory stops to suspected felony offenses. Thus, the officer's stop of Defendant was valid even though the littering allegation was only a misdemeanor." Id.

In this case, Deputy Franzoy's suspicion that Defendant had committed the misdemeanor offense of littering was based upon the following: (1) Deputy Franzoy had driven past the gravel pit earlier on the morning of November 1, 2008 and did not notice much litter, even though he knew (from previous, personal observation) that targets, such as cans and bottles and spent shell casings, were frequently left behind by individuals practicing target shooting; (2) at approximately 12:40 p.m. that same day, Deputy Franzoy heard seven or eight shots, and believed the sounds came from the area of the gravel pit; (3) when Deputy Franzoy arrived at the gravel pit, he noticed Defendant enter his pickup and begin to drive away; and (4) Deputy Franzoy noticed targets that he believed Defendant had left behind. [See Doc. 37 at 1-3]. Clearly, Deputy Franzoy possessed a reasonable, articulable suspicion that Defendant had committed a crime, even if it was the misdemeanor offense of littering. Consequently, Deputy Franzoy was within permissible constitutional bounds when he stopped Defendant for the purpose of investigating a littering offense.

### B. Whether the length and scope of Defendant's detention was unconstitutionally excessive

Defendant next argues that if the Court should determine the initial stop to have been constitutionally valid, his ensuing detention was excessive in both scope and length. He explains:

15

> Deputy Franzoy stopped Defendant and directed him to pick up the shooting targets. When Defendant had completed the task, Deputy Franzoy asked for and received Defendant's identification information, which returned "clear." It was only after Defendant had picked up the shooting targets, and had returned "clear," that the [sic] Deputy Franzoy asked the questions that elicited the information about Defendant's prior criminal case. It was this illegally derived information about Defendant's prior criminal case that led to the subsequent searches, seizures of contraband, and further incriminating statements that form the basis of the instant case.

[Doc. 33 at 4-5].

As explained above, the Court views and evaluates Deputy Franzoy's November 1, 2008 stop of Defendant as a Terry stop, rather than a traffic stop subject to analysis under such cases as United States v. Hunnicutt. A Terry stop, however, will be deemed unconstitutional if it continues for an excessive period of time. United States v. Villagrana-Flores, 467 F.3d 1269, 1275 (10th Cir. 2006) (*citing* United States v. Place, 462 U.S. 696, 709 (1983)). Nevertheless, "[United States Supreme Court] decisions make clear that questions concerning a suspect's identity are a routine and accepted part of many Terry stops." Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt County, 542 U.S. 177, 186 (2004). The underlying rationale is that

> [o]btaining a suspect's name in the course of a Terry stop serves important government interests. Knowledge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder. On the other hand, knowing identity may help clear a suspect and allow the police to concentrate their efforts elsewhere.

Villagrana-Flores, 467 F.3d at 1275 (*quoting* Hiibel, 542 U.S. at 186).  Indeed, "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."  Adams v. Williams, 407 U.S. 143, 146 (1972).

The Tenth Circuit has expressly held that it is not a violation of the Fourth Amendment for an officer conducting a Terry stop to obtain the stopped individual's identity and perform a warrants check.  Villagrana-Flores, 467 F.3d at 1275.  The circuit has explained that a warrants check is "reasonably related in scope to the circumstances which justified the interference in the first place" because (1) the detaining officer has a strong interest in knowing whether the stopped individual has a violent past or is currently wanted on outstanding warrants; (2) permitting a warrants check during a Terry stop promotes the strong government interest in solving crimes and bringing offenders to justice; and (3) an identity's utility in informing an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder, would be non-existent without the ability to use the identity to run a criminal background check.  Id. at 1277.

Accordingly, it cannot seriously be disputed that Officer Franzoy, having detained Defendant for the offense of littering, was justified in conducting a wants-and-warrants check on him.  Moreover, it was at the time that Deputy Franzoy took Defendant's driver's license for the purpose of having the wants-and-warrants check run—and saw Defendant's name—that Deputy Franzoy began to remember Defendant more specifically. [See Doc. 48 at 38 ("As I ran his ID, then I remembered the name."); at 39 ("Whenever I got his license,

the name helped to job my memory a little bit more about who he was."); at 39-40 ("[O]nce I saw the name, the driver's license and saw the name, then I remembered who he was."); at 40 ("[Seeing Defendant's name] helped to draw it all together.")]. Defendant's argument, however, is that once information from the wants-and-warrants check returned as "clear," he should have been allowed to continue on his way; instead, Deputy Franzoy persisted in asking the questions that elicited the information about Defendant's criminal past.

Defendant's argument overlooks the fact that, whenever it was, precisely, that Deputy Franzoy remembered Defendant from their August 2006 encounter (*i.e.*, when he saw Defendant's name on his driver's license; when the wants-and-warrants check returned clear; or sometime thereafter) Defendant remained under investigative detention for the littering offense. [See Doc. 48 at 37 ("When he came back clear . . . I still had him detained. He was still investigative detention at that time."); at 36 (explaining that when the information returned as "clear," Deputy Franzoy continued to have a need to detain Defendant, because he had not yet written him a citation, which was his intention at that time.)]. Thus, Defendant was still under investigative detention when Deputy Franzoy remembered that he knew Defendant from having assisted federal agents during Defendant's August 2006 arrest for a firearms offense. At that time, Deputy Franzoy developed probable cause to believe that Defendant, who had admitted to shooting at targets and in whose pickup Deputy Franzoy had observed a firearm, was committing another firearms offense. To be sure, as Deputy Franzoy explained, after he (1) saw Defendant's driver's license; (2) had the wants-and-warrants check performed; and (3) remembered Defendant from the men's August 2006

18

encounter, "[he] started thinking . . . this is a felon in possession case, it's not really a littering case anymore." [Id. at 46]. Accordingly, what began as Deputy Franzoy's reasonable suspicion of criminal activity (littering) subsequently ripened into probable cause to believe that Defendant was a felon in possession of a firearm. See Oliver v. Woods, 209 F.3d 1179, 1185-90 (10th Cir. 2000) (discussing, in qualified-immunity context, the ripening of reasonable suspicion of criminal activity sufficient to justify a Terry stop into probable cause to believe detained individual was in violation of Utah law prohibiting the refusal to identify oneself). Deputy Franzoy's actions with respect to Defendant on November 1, 2008 were withing permissible constitutional bounds. Consequently, Defendant's motion to suppress will be denied.

### III. CONCLUSION

For the reasons stated herein, Defendant's motion to suppress is denied.

**IT IS, THEREFORE, ORDERED** that *Angel Marta's Motion to Suppress* [Doc. 33] is **DENIED**.

**SO ORDERED** this 11th day of September, 2009, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge